## No. 11,502.

## MALEY v. HEICHEMER, ET AL.

Decided April 25, 1927.   Rehearing denied May 16, 1927.

Action in replevin.   Judgment for defendant and intervener.

### *Affirmed.*

1.  INTOXICATING LIQUOR—*Contraband Goods—Forfeiture.*   Where cases of canned tomatoes were used as a subterfuge and sham escort to conceal cases of intoxicating liquor shipped therewith, they became contraband and subject to forfeiture to the state.

2.  *Contraband Goods—Assignment.*   An attorney taking an assignment of cases of canned tomatoes with notice that they had been used to conceal a shipment of intoxicating liquor, acquired no property right therein as against the state's claim of forfeiture.

3.  ASSIGNMENT—*Title.*   Where a person has no interest in property, his assignment thereof conveys nothing.

4.  INTOXICATING LIQUOR—*Property Rights.*   Cases of canned tomatoes used to conceal a shipment of intoxicating liquor packed in similar cases, held subject to forfeiture under section 3720, C. L., and the state entitled to assert a property interest therein.

5.  *Search and Seizure.*   An attorney taking possession under writ of replevin of his client's contraband goods assigned to him, and which the court had ordered left in a warehouse, could not complain that the state—in declaring a forfeiture—had not followed the statutory provisions relating to seizure of such property.

6.  *Contraband Property—Court Jurisdiction.*   Pending criminal proceedings involving violations of the prohibition statutes, cases of canned tomatoes which were used to conceal a shipment of intoxicating liquor, held to have been in custodio legis, and subject to the orders of court.

7.  EQUITY—*Remedies.*   Where there is a wrong, there is a corresponding remedy.

8.  EVIDENCE—*Sufficiency.*   Where evidence taken together tends to prove the issues, it is sufficient, regardless of the fact that each fragment of testimony would not be conclusive.

9. REPLEVIN—*Return of Property—Value.* Although the defeated party in a replevin suit has made it impossible to return the goods, he is not relieved from accounting for their value.

*On Rehearing.*

10. APPEAL AND ERROR—*Rehearing.* Although a party should be right in his contention on one of the questions raised on rehearing, if it would not affect the ultimate result, the rehearing will be denied.

*Error to the District Court of the City and County of Denver, Hon. Henley A. Calvert, Judge.*

Mr. HORACE N. HAWKINS, JR., for plaintiff in error.

Mr. FOSTER CLINE, Mr. HAROLD CLARK THOMPSON, for defendants in error.

*En Banc.*

MR. JUSTICE ADAMS delivered the opinion of the court.

MALEY, plaintiff in error and plaintiff in the trial court, brought a replevin action against Heichemer, doing business as City Warehouse Company, defendant, to recover 500 cases of tomatoes. The people of the state of Colorado intervened. Maley obtained possession of the goods under the replevin writ, but disposed of them before the final determination of the case. Judgment was against plaintiff in favor of defendant Heichemer for warehouse charges, and against plaintiff and in favor of intervener, the people, for the value of the goods. Maley prosecutes a writ of error to set aside the judgment against him in favor of the people. No one else is involved; all parties have admitted that the judgment for the warehouse charges is correct.

Maley is a lawyer; he claimed the goods and now claims the proceeds thereof under a bill of sale obtained on January 24, 1925, for a fee from one of his clients by the name of Gilbert Olace, who at that time was incar-

cerated in the Denver county jail, awaiting trial on divers charges of having violated the prohibition law. The state claimed the same goods and now claims their proceeds on the ground that neither Olace nor Maley had any property rights in them because forfeited to the state, for, it is said, they were used or kept as a subterfuge, and as contrivances, things or devices for the purpose of violating the state law relating to intoxicating liquors.

The controversy arose in this wise: December 13, 1924, a freight shipment from San Francisco, California, purporting to be from California Food Products Company, and to consist of 600 cases of canned tomatoes, was routed to City Warehouse, Denver. They were said to contain solid pack tomatoes of 1924 crop as follows: 150 cases Del Monte brand, 350 cases Libby McNeil and Libby brand and 100 cases Star brand tomatoes, and the cases or wooden boxes were each separately labelled in accordance with these designations. Both in shipment and at the warehouse, the cases were commingled, and all were claimed by the same proprietor. They were shipped in one car from San Francisco. The shipper wrote the warehouse to take charge of the car and to hold it subject to disposal of its representative, who would present an order for withdrawal of any or all cases. The shipper's "representative" was Olace; the bill of lading was sent to him with above withdrawal order. After arrival of the shipment, Olace withdrew a few of the cases labelled "Star brand," and left about 87 cases of that brand and all of the other brands at the warehouse.

Five hundred cases, now the subject of this controversy, consisting of the 150 cases of Del Monte brand, and the 350 cases of Libby McNeil and Libby brand, contained genuine tomatoes, but the 100 cases labeled "Star brand" contained bottles of intoxicating liquor. The police discovered the plot, arrested Olace and an alleged confederate by the name of Morris, and on January 14, 1925, seized and destroyed all that was left of the intoxi-

cating liquor in the 87 cases of "Star brand" at the warehouse. Until then, the warehouseman did not know of the deceptive nature of the bailment. The police did not molest the 500 cases of genuine tomatoes remaining in the warehouse. The intoxicating liquor involved in the charges against Olace and Morris came in the above California shipment. Bill of lading and letter from California Food Products Company were found on Olace's person when arrested. Morris thereafter pleaded guilty and was fined; Olace was tried and convicted on two counts; the conspiracy charge against the two was pending when the replevin suit was brought.

On January 24, 1925, Olace, then in jail, at a conference between him and his attorney Maley, the plaintiff, executed a written instrument, purporting to assign and transfer to Maley all Olace's right, title and interest in and to the 500 cases of tomatoes stored at the warehouse.

Maley did not then try to get the tomatoes, but on the same day took the Olace bill of sale and delivery order to the warehouse company, got a receipt in which it is said that the company holds the tomatoes for Maley, subject only to the approval of the shipper, California Food Products Company. Within 48 hours thereafter— on January 26—the district attorney upon behalf of the people obtained an ex parte order in the criminal division of the district court, in one of the cases charging Morris and Olace with violating the intoxicating liquor law, and in which case Maley was Olace's lawyer. The order was on the district attorney's petition, claiming the tomatoes as contraband to be confiscated; that they were in above warehouse and that the defendants (Morris and Olace) and their attorneys were making an effort to obtain possession and control of them. The petition refers to 400 cases; whether this is a stenographic error or not we do not know, but the court order reads 500. It says: "*   *   *   It is hereby ordered, adjudged and decreed: That the City Warehouse Company, 901 Wazee street, Denver, Colorado, is ordered not to permit the defendants

(Morris and Olace) or either of them, their agents or attorneys or any other person whomsoever to remove any portion of the five hundred cases of tomatoes now stored in said warehouse, which tomatoes were consigned to said warehouse, together with one hundred cases of intoxicating liquor.

This order is to be in force and effect until further order of the court concerning said five hundred cases of tomatoes.

By the Court: Charles C. Sackmann, Judge.''

Maley does not claim not to have known about the above order; he ignored it, however, claiming that it was void because, he says, the court had no jurisdiction to issue it. He says in his replevin suit that he demanded possession of the tomatoes from the warehouse company on February 27, 1925, although it appears elsewhere that there was an earlier refusal by the warehouse company, due to the service of the court order. On the day last named, Maley brought this replevin action. The sheriff took possession of the 500 cases of tomatoes under the writ, and as no redelivery bond was given, turned them over to plaintiff. He sold them a few days afterwards, without waiting for the outcome of the law suit, and kept the proceeds. Thereafter, on March 6, 1925, the people of the state of Colorado intervened. The district attorney in his intervention stated the facts about the cases against Morris and Olace; recited the court order of January 26, and set forth in detail that the 500 cases of genuine canned tomatoes were used by Morris and Olace as a contrivance, thing and device for the purpose of conveying and assisting in conveying to Denver, 100 cases of intoxicating liquor; that the 500 cases were used as a device, contrivance and thing to camouflage, disguise and conceal the 100 cases of intoxicating liquor, in violation of law. The intervener sought to confiscate the 500 cases and to have them forfeited to the state and sold. Upon the trial, the court directed a verdict against the plaintiff and in favor of defendant for the warehouse charges, and in favor of

intervener for the value of the chattels, as plaintiff's actions had rendered their return impossible.

As to California Food Products Company, apparently there was no such concern; its letter head was deceptive; a letter addressed to its supposed California address was returned unclaimed. This pseudo company and Olace may be considered as one and the same. The record does not show him to have been engaged in any particular occupation other than that of generally plying his unlawful trade in intoxicating liquors.

There are five main branches of the case to consider: (1) The rights of Olace in the tomatoes in question, up to the time that he sold them or attempted to sell them to Maley; (2) Maley's interest, if any; (3) the interest, if any, of the state; (4) the procedure followed by the state in asserting its claim, and (5) questions of evidence.

1. Under the chapter concerning intoxicating liquors, C. L. 1921, section 3720 reads: "There shall be no property rights of any kind whatsoever in any liquors, vessels, appliances, fixtures, bars, furniture, implements, wagons, automobiles, vehicles, contrivances, or any other things or devices used in or kept for the purpose of violating any of the provisions of this act."

Without repeating the narrative above set forth, or the corroborating circumstances in the voluminous record, we have no hesitancy in expressing our belief that the trial court was right in holding that no matter what property rights Olace had in the 500 cases of genuine tomatoes before he broke the intoxicating liquor law, said section 3720 became operative simultaneously with its infraction. There was no bona fide shipment of honest goods; the genuine tomatoes were in one car load shipment from the same consignor, for the use of the same consignee; they were used and kept only as a subterfuge and sham escort to conceal the dishonest character of the false labels on the 100 cases of so-called "Star brand" tomatoes. They were so used and kept, not only in transit, but also at the warehouse, until the intoxicants were

seized by the officers. The convictions and one confession in the criminal cases, as well as other evidence, confirm this. Olace peddled some of the intoxicating liquor until interrupted by the authorities. The genuine tomatoes were used and kept as a contrivance, thing and device for the purpose of violating the prohibition law. They thereby became contraband and subject to forfeiture to the state.

2. As to Maley's rights: As we have seen, Olace owned nothing on January 24, 1925. Maley was fully appraised of the precarious tenure under which Olace held the bill of lading for the tomatoes in the warehouse, when Maley then got his bill of sale from Olace, then in jail, and thus obtained such purported assignment. It concerned the very thing for which Olace was then incarcerated, and in the defense of which Maley was employed as attorney. Maley himself said: "He (Olace) was charged with first offense violation of the prohibition law in one case. He was charged with conspiracy to violate the prohibition law in another case, and charged by the federal government with transporting from one state to another intoxicating liquor. The fee I got out of it was entirely inadequate.   *   *   *" It would reflect too gravely upon Maley's own intelligence to say that he did not know. Indeed we do not understand that he seriously contends that he did not know the facts; he relies mostly upon supposed defects in the intoxicating liquor law, and in the course followed by the district attorney.

Since Olace owned nothing, his assignment of all his right, title and interest therein to Maley conveyed nothing. The latter was not an innocent purchaser. He had notice and knowledge sufficient to put him on inquiry, to say the least, and therefore is not assisted by his reference to *Hoover v. People,* 68 Colo. 249, 187 Pac. 531.

3. Notwithstanding section 3720, C. L. 1921, it cannot be said that things useful in themselves can be so completely outlawed that not even the state can have an inter-

est or ownership in them. To say this would be to defeat the statute itself, and to deprive the school fund of the proceeds of contraband libeled by the state. The state is the very one to assume control in case of forfeiture. Here, by Olace's unlawful act, the genuine tomatoes became subject to confiscation by the state alone, the forfeiture to be declared in an appropriate proceeding. We do not have to destroy a valuable automobile, even though once occupied by a murderer, nor wantonly ruin or cast aside any article not in itself harmful, merely because it was once unlawfully used. We said in a criminal proceeding that even intoxicating liquor may be the subject of larceny. *People v. Kilpatrick,* 79 Colo. 303, 245 Pac. 719. The right of the state to declare a forfeiture having vested, it remains to be determined whether the procedure was proper.

4. Plaintiff's position is that section 3711, C. L. 1921, relating to search and seizure, and the following sections, 3712 and 3713, provide an exclusive remedy and method of procedure, but we think that he was most too astute in bringing his replevin suit, and in now charging the state with failure to do the things that he himself prevented the officers from doing. He got a bill of sale for contraband wares from his client in jail; he coolly ignored the court order about leaving the tomatoes where they were in the warehouse until further orders, which direction was made in the criminal case he was defending; he demanded possession of the contraband from the warehouse in the face of the order, and failing in his purpose went to the civil division of the court and brought replevin to recover it. In doing this, he disregarded the peace officers, as well as the court order, and although the replevin action came swiftly upon the heels of the engrossing events in the criminal court in which he was an important actor, and with the knowledge thus acquired, his complaint in replevin is nevertheless accompanied by his affidavit, which contains the disingenuous statement that "the alleged cause of detention thereof is to

this plaintiff unknown.  These facts carry their own commentary.

Plaintiff's counsel favors us with no authorities in support of his proposition that the court order of January 26 to leave the 500 cases of tomatoes in the warehouse until further orders was void for want of jurisdiction, nor does the district attorney.  This inclines us to make a ruling without independent research for precedents, and to create one of our own.  It is of course true that the court in the above cases against Morris or Olace could not try title to, nor determine the ultimate right of possession in personal property, particularly when claimed by third persons; such were not the issues, but the court had no such notion.  On the other hand, the inherent power of the court during the pendency of even a criminal case to make summary and reasonable orders in furtherance of justice, involving the temporary custody of goods claimed by the state as contraband, cannot be questioned.  If plaintiff is right in his supposition that this is not so, it must then follow that money and valuables, the loot of criminals, and the title to which is in dispute, or even when needed as evidence, may be taken from the table and carried away with impunity from under the eyes of the court and against its orders, and the court is powerless because it has no jurisdiction.  The word "jurisdiction" is not to be so grossly abused.  The chattels for the time were *in custodio legis,* and with good reason.

But plaintiff goes farther and argues that there is now no way for the state to get the goods, for he has sold them, nor to recover the proceeds which he so acquired, and that the state cannot even test its right to the goods or proceeds.  The argument overreaches itself.  Where there is a wrong, there is a remedy.  The temporary order was to preserve the status for the time, and while operative it not only stayed the hands of the warehouse company, Morris, Olace, plaintiff and others, but also suspended and held in abeyance the right of the state to

confiscate the property. It protected plaintiff as much as the state; he made no move to dissolve the order and acquired no right by disobeying it. No rights of innocent parties intervened, and since plaintiff himself by his precipitate and unwarranted conduct made it impossible for the peace officers to comply strictly with the statute, he does not stand in a good place to say that it was not followed.

5. The evidence objected to bore upon the question of the contraband character of the goods, and upon Maley's connection with and knowledge of the affair. It was not necessary that each fragment of the testimony should be conclusive. Taken together, it tended to prove the issues and we find no error in the admission or rejection of evidence.

6. The search for authorities by plaintiff's able counsel has led to the citation of many cases as precedents, but we cannot look upon them as such because the facts are not analagous. We doubt if another case like this novel affair is to be found reported, and so we must resort to principles. Neither is it always easy nor possible to furnish a blanket rule to cover subsequent cases, without forecasting all coming events, which no one can do. To attempt it would work an injustice to future litigants who may act differently than has the plaintiff in this case. We must be content if convinced that the law is correctly applied here, as we think it is. Machinations to defeat the prohibition law are as devious and unexpected as human ingenuity can contrive. The peace officers acted with diligence and all reasonable dispatch in the discharge of their difficult tasks in the face of many stumbling blocks, and we are not disposed to set their works at naught. That replevin is not an ideal way for the state to assert its rights under the prohibition law, may be granted, but plaintiff, not the state, started the replevin. Plaintiff chose the battle ground, but did not vanquish his adversary; he left open to the people only one gate, that of intervention, which it entered before

it was too late. Plaintiff made it impossible to return the goods, but did not make it impossible for him to account for their value. 23 R. C. L. § 67, p. 906. He "fell into the pit that he dug for another," and is remediless.

Judgment affirmed.

## On Rehearing.

PER CURIAM.

The only new point worthy of note in the petition for rehearing, filed by plaintiff in error, is his statement that the attitude of apparent acquiescence or agreement upon the part of the district attorney, as to the claim of plaintiff in error that the court order dated January 26, 1925, was void, lulled his counsel into not arguing the point. He now wishes to argue it orally, but a majority of the court are of the opinion that even if he should prevail on this one question, it would not affect the ultimate decision. The petition for rehearing is therefore denied.